# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 4946 | DATE | March 8, 2004 |
| CASE TITLE | Barbara Jo Henry   v   Ameritech Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Hearing
(5) ☐ Status hearing
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]
    Memorandum opinion and order entered.   Accordingly, defendant's motion for summary judgment under Fed. R. Civ. P. 56 is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| X | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 09 2004 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 23 |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| GDS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BARBARA JO HENRY, )
 )
    Plaintiff, )
 )
 ) No. 02 C 4946
v. )
 ) Judge Robert W. Gettleman
AMERITECH CORPORATION, )
 )
    Defendant. )

**DOCKETED**

**MAR 0 9 2004**

## MEMORANDUM OPINION AND ORDER

Plaintiff Barbara Jo Henry filed the instant lawsuit against her former employer, Ameritech Corporation ("Ameritech"), alleging that Ameritech "intentionally engaged in discrimination by terminating Plaintiff from her employment because of her race, Black, in violation of Title VII [42 U.S.C. §§2000 et seq.] and 42 U.S.C. § 1981." Defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56, arguing that plaintiff has failed to establish a prima facie case of discrimination and also failed to rebut defendant's asserted non-discriminatory reason for terminating plaintiff's employment. For the reasons stated herein, defendant's motion for summary judgment is granted.

### FACTS[1]

Plaintiff, an African-American woman, worked for Ameritech from November 11, 1971, through her termination on September 21, 2001. After working in a management position from 1999 to May 2001 in Ameritech's Chicago Heights office, plaintiff assumed the position of Customer Advocate in June 2001. Plaintiff's responsibilities included receiving incoming calls,

---

[1]Unless otherwise noted, the following facts, taken from the parties' L. R. 56.1 Statements and attached exhibits, are not in dispute.

23

handling disputes for local usage, new service, and misdirected payments. Customer Advocates also performed a sales function that required them to consult with clients about additional services and products.

In 2001, Customer Advocates in the Chicago Heights Office participated in Ameritech's Cash Incentive Plan, which encouraged sales by awarding cash bonuses to employees who exceeded their monthly sales objectives as follows: (1) if a Customer Advocate achieved 100% of her monthly sales objective, she received a $250 award; (2) if she achieved 112% of her monthly sales objective, she received a $400 award; and (3) if she achieved 120% of her monthly sales objective, she received a $500 award. In June 2001, the monthly sales requirement was $3500 per month; this objective was reduced proportionately when a Customer Advocate took vacation or was temporarily assigned to another position.

Each Customer Advocate is assigned a sales code, which is a unique designation that is used to identify the Customer Advocate who negotiated an order for a particular service (in case there is later contact from the customer concerning the order) and track his productivity. Customer Advocates are trained to accurately record their sales codes whenever contact with a customer results in negotiation of an order for services.

The parties dispute whether Ameritech's management condoned a practice called "sales sharing," in which one Customer Advocate would take credit for a sale that she neither negotiated nor worked on herself. Although Ameritech did not provide a written directive explicitly prohibiting sales sharing per se, Ameritech's Code of Business Conduct provides as follows:

> You are responsible for the integrity of company records over which you have control. Company business records must be prepared accurately. Reliable records are of critical importance in meeting our financial, legal and management obligations. Reports, vouchers, bills, payroll and service records, benefit claims and records, measurement and performance records, and other essential data should be prepared with care and honesty. Service and cost performance measures, for example, are a key to the successful management of the business. Making a false or misleading report or record of measurement data is as serious as falsifying vouchers, financial data or records pertaining to company funds or property.

Plaintiff received a copy of Ameritech's Code of Business Conduct and was given an opportunity to read the Code and ask any questions. Each year, Customer Advocates are required to re-read the Code and sign an acknowledgment that they have done so.

According to plaintiff, Ameritech managers Tina Fisher-Harper, Kim Burdine, and Keith Roberts were aware that sales sharing occurred among Ameritech employees to enable those employees to attain their monthly sales objectives. To this end, plaintiff submitted affidavits from Sheila Childs and Ardilia Cross, Customer Advocates who were supervised by Fisher-Harper, in which they both state that Customer Advocates supervised by Fisher-Harper routinely shared sales, and that Fisher-Harper encouraged her team members to assist other team members in meeting their sales objectives. According to Cross, on at least one occasion, Fisher-Harper personally provided Childs with the sales code of a Customer Advocate on her team, Belinda Barnes, so that Childs could give Barnes a sale.

When plaintiff was working as a Customer Advocate, she was not supervised by Fisher-Harper, Roberts, or Burdine, but rather was directly supervised by Kezia Morris. Plaintiff's senior manager was Jacqueline Payne. There is no evidence that either Morris or Payne were aware of sales sharing or otherwise condoned or authorized the practice.

In May 2001, just before plaintiff was supposed to leave her temporary management position and resume her duties as a Customer Advocate, Sheila Childs asked plaintiff if she needed any sales to meet her monthly objective. Plaintiff felt that such a sale would give her a start for June and thus accepted Childs' offer. Plaintiff gave Childs her sales code so that Childs could complete the order and apply the sales revenue to plaintiff's sales code.

This was not the first time that plaintiff had shared sales. When she was working in her temporary management position from 1999 to May 2001, under Keith Roberts' supervision, plaintiff did not have a sales objective. Rather than have plaintiff take credit for sales that did not amount to anything, Roberts permitted plaintiff to share her sales with Customer Advocates who had failed to meet their quotas.

In June 2001, Childs brought plaintiff a slip of paper with an order number on it for the sale that Childs had offered plaintiff. Plaintiff does not dispute that she did not do any work on this particular sale. Childs told plaintiff that the order was for an ISDN contract. Plaintiff believed the contract was worth $1,800 and that Childs had made the sale herself, even though Childs did not indicate to plaintiff that she had done any work on the sale. Plaintiff placed the order number onto a tracking log on which Customer Advocates keep track of the value of their sales.

As it turned out, the order was actually one of 23 ISDN Prime[2] orders generated by an Ameritech Authorized Distributor, not Childs, and resulted in $4,865 in revenue being credited to plaintiff's sales account. ISDN sales by Ameritech Authorized Distributors are forwarded to

---

[2]ISDN Prime is a high speed voice and data communications service that Ameritech offers its customers.

4

Ameritech's ISDN Provisioning Center (the "AIPC Center") for provisioning by Market Support Specialists ("MSS"), who neither have direct contact with customers nor receive any credit or bonus for ISDN sales. At least some of these 23 ISDN Prime orders came into the AIPC Center without a sales code. At Childs' request, two MSS's, Tondaleria Marcus and Latasha Sanders, placed Childs' sale code on those orders, and Childs in turn replaced her sales code with those of other Customer Advocates in the Chicago Heights Call Center, including plaintiff. The parties dispute whether Marcus and Sanders were authorized by their supervisor, Roberts, to place Childs' sales code on the unaccounted-for orders.

In July 2001, Payne, the senior supervisor, asked Area Manager Jacqueline Jones to run a computerized report examining the sales activities of the Chicago Heights Call Center. In running the report, Jones noticed that the same customer number was appearing on several Customer Advocates' sales sheets for ISDN Prime orders. Further investigation revealed that the sales of the ISDN Prime orders were made by an Ameritech Authorized Distributor, not an Ameritech employee.

Payne and Cynthia Williams, an employee in Ameritech's Human Resources Department, subsequently interviewed every Chicago Heights employee whose sales code appeared on any of the ISDN Prime orders. Of the nine employees involved, three actively changed sales codes on the ISDN Prime orders resulting in sales revenue being credited to themselves or another Customer Advocate: Sheila Childs, Michelle Tate, and Leslie Edwards. Sheila Childs claimed that she called the AIPC Center to request that her sales code be placed on ISDN Prime orders because her supervisor, Fisher-Harper, told her to do so. Fisher-Harper denied authorizing

5

Childs to request sales credit for the ISDN Prime orders from the AIPC Center, and further stated that she did not authorize Childs to place other Customer Advocates' sales codes on those orders.

Three other employees, Alice Quarles, Charlotte Hamilton, and Rebecca Johnson, acknowledged authorizing use of their sales codes, but the particular ISDN orders on which their sales codes were placed did not generate sales revenue. Two other Customer Advocates, Belinda Barnes and Susan Hawkins, denied any knowledge of the scheme, denied authorizing the use of their sales codes, and did not receive sales revenue credit from the orders on which their sales codes were placed. Plaintiff acknowledged that she knew of the scheme, authorized the use of her sales code in furtherance thereof, and received sales revenue credit as a result, which led to a $500 bonus that she would not have otherwise received.[3]

Of the nine Customer Advocates whose activities were under scrutiny, only Rebecca Johnson and Sue Hawkins are white. The remaining seven Customer Advocates, Sheila Childs, Michelle Tate, Leslie Edwards, Charlotte Hamilton, Alice Quarles, Belinda Barnes, and plaintiff, are African-American.

After Williams and Payne conducted these interviews, employees of Ameritech's Asset Protection Department interviewed eight of the nine employees (except for Barnes, who was absent from the office at the time). All eight employees provided written statements, which were

---

[3] The $4,865 plaintiff received in revenue credit from the ISDN Prime sale, taken together with the $3,001 in other sales secured by plaintiff in June 2001, resulted in a $500 bonus (based on plaintiff's $3,500 objective). According to Ameritech's Performance Status Report for June 2001, attached as an exhibit to plaintiff's L.R. 56.1 statement, plaintiff's sales objective for June 2001 was actually only $2,667, not $3,500, because she had taken a week-long vacation the first week of June. Thus, plaintiff was actually entitled to a $400 bonus even without the extra sale she received from Childs (because plaintiff's $3,001 in sales was more than 112% of her $2,667 June sales objective).

6

then forwarded to Payne for her consideration. According to plaintiff's statement, she would not have been able to meet her sales objective in June 2001 if Childs had not processed the ISDN Prime order for her.[4]

Based on the interviews and the employees' written statements provided to Asset Protection, Payne suspended Childs, Tate, Edwards, Hamilton, Quarles, Johnson and plaintiff, pending termination. Barnes and Hawkins received no discipline.

As members of the Local 188 of the International Brotherhood of Electrical Workers, the suspended Customer Advocates were entitled to hearings before the Union-Management Review Board. Plaintiff's hearing occurred in October 2001. According to Payne's affidavit, she decided to terminate plaintiff because she knowingly allowed her sales code to be used in furtherance of the scheme and received revenue credit for ISDN sales. Payne also terminated Childs, Edwards, and Tate because they changed codes on ISDN orders and received revenue credit for ISDN Prime Sales. Payne allowed Hamilton, Quarles, and Johnson to return to work following their suspensions without pay; even though they allowed their sales codes to be used improperly, they did not receive revenue credit for any ISDN Prime sales.

In deciding what levels of discipline to impose, Payne received input from Williams and Toni McGhee, the Labor Relations Case Manager. The final decision regarding discipline was Payne's, however.

---

[4] In her L.R. 56.1 statement, plaintiff contends that she signed her written statement under duress. The cited portions of her deposition that purportedly support that contention are conspicuously absent from plaintiff's L.R. 56.1 exhibits, however. Moreover, in her response to defendant's L.R. 56.1 statement, plaintiff admits that she testified in her deposition that the portion of her written statement claiming that "[n]o force, threats, coercion, promises, or gratuities have been made to me to induce this statement," was correct.

Prior to plaintiff's termination, Ms. Payne had received numerous letters from clients commending plaintiff's service to customers. Moreover, plaintiff's Performance Status Reports for June 2001 and July 2001 rated plaintiff as "above expectations" and "significantly above expectations," respectively.

## **DISCUSSION**

A movant is entitled to summary judgment under Fed. R. Civ. P. 56 when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Plaintiff has not produced direct evidence that establishes defendant discriminated against her because of her race. Accordingly, to establish her prima facie case of discrimination with respect to her termination, plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse

employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002).

Once plaintiff has established a prima facie case of discrimination, the employer must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. Id. If the employer proffers such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext. Id.

Defendant does not dispute that plaintiff is a member of a protected class, or that she suffered adverse employment action through her termination. Rather, defendant disputes that plaintiff has satisfied the second and fourth elements of her prima facie case. According to defendant, an employee who falsifies her employer's documents or is otherwise dishonest is not meeting her employer's reasonable expectations, and plaintiff has not produced evidence that similarly situated employees who are not African-American were treated more favorably than she. The court addresses each of these contentions separately below.

According to defendant, "[i]t is universally recognized that an employee who falsifies her employer's documents or is otherwise dishonest is not meeting her employer's reasonable expectations." In support of this proposition, defendant cites to Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359 (7th Cir. 1988), Williams v. United Parcel Service, Inc, 1994 WL 517244 (N.D.Ill. Sept. 20, 1994), and Bagnell v. Komatsu Dresser Co., 838 F. Supp. 1279 (N.D.Ill. 1993). None of those cases, however, held that an employee did not meet his employer's reasonable expectations due to falsification of employer documents. To the contrary, all of those cases were decided under the pretext prong of the discrimination analysis, and thus do not

compel the conclusion that plaintiff in the instant case failed to meet her employer's reasonable expectations. See, e.g., Williams, 1994 WL 517244, at *3 ("Although UPS says that Williams was not performing satisfactorily because he violated the timecard policy, this argument is relevant to our inquiry regarding whether UPS' explanation for terminating plaintiff is legitimate or pretextual, and not to plaintiff's prima facie case.").

The court also notes that plaintiff has produced evaluations from June and July 2001 indicating that she was performing above her employer's expectations. Moreover, there is no evidence that plaintiff had ever been disciplined before the incident at issue in the instant dispute. Drawing all reasonable inferences in plaintiff's favor, the court thus concludes that plaintiff has satisfied the second element of her prima facie case.

The court is not persuaded that plaintiff has satisfied the fourth element of her prima facie case, however. To demonstrate that employees are similarly situated to her, plaintiff must show that they are "directly comparable to [her] in all material respects." Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). In the context of alleged discrimination in a disciplinary situation, "a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000) (citation omitted). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id.

The evidence in the instant case is that all of the Customer Advocates who gave their sales codes to Childs and received revenue credit as a result were terminated by Payne. The two

10

white employees who were not terminated as a result of Payne's investigation, Hawkins and Johnson, were not similarly situated to plaintiff because neither of them received revenue credit, and thus a bonus, as a result of the use of their sales codes on the ISDN Prime orders.

Nor were Hawkins and Johnson the only employees who received a lesser punishment than plaintiff. Three black employees, Barnes, Quarles, and Hamilton, who Payne determined did not receive revenue credit, were either suspended without pay or received no discipline. If anything, this suggests that Payne treated similarly situated employees <u>similarly</u>, not differently. Accordingly, plaintiff has failed to establish the fourth element of her <u>prima facie</u> case.

Even if the court concluded otherwise, defendant would still be entitled to summary judgment. Defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination: falsification of company documents in violation of Ameritech's Code of Conduct. In order to establish that defendant's proferred reason is pretextual, plaintiff must demonstrate that the explanation is dishonest, rather than merely an error. <u>Wells</u>, 289 F.3d at 1006 (citing <u>Kulumani v. Blue Cross Blue Shield Ass'n</u>, 224 F.3d 681, 685 (7th Cir. 2000)). "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." <u>Grube v. Lau Indus., Inc.</u>, 257 F.3d 723, 730 (7th Cir.2001) (internal quotations omitted). To demonstrate pretext, plaintiff must demonstrate that defendant's articulated reason for her discharge either: (1) had no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge. <u>Wells</u>, 289 F.3d at 1006. For the reasons stated below, the court concludes that plaintiff has not established pretext in the instant case.

The undisputed facts establish that plaintiff accepted sales credit for an order negotiated by an Authorized Ameritech Distributor, and received a $500 bonus as a result. Thus, plaintiff cannot maintain that her discharge had no basis in fact.

The crux of plaintiff's argument instead seems directed at the second and third bases for establishing pretext. According to plaintiff, sales sharing occurred routinely among Customer Advocates, and thus could not have been, or perhaps should not have been, the basis for her termination. Although plaintiff has produced evidence that Fisher-Harper and Roberts condoned sales sharing, this is insufficient to establish pretext under Seventh Circuit precedent because there is no evidence whatever that Payne, or any other decisionmaker involved in plaintiff's termination, was aware of the practice or otherwise condoned it.

In Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1366(7th Cir. 1989), the Seventh Circuit affirmed summary judgment in favor of a defendant employer who fired an employee for violating the employer's time card policy. In that case, the plaintiff argued that the stated reason for firing him was pretext in light of the undisputed fact that other employees routinely entered hours on their time cards that did not reflect the actual time worked. Id. According to the plaintiff, strict adherence to the time card falsification policy in his case was merely pretext for age discrimination.

The Mechnig court rejected that argument, noting that the plaintiff's evidence of time card practices "does not bear in any significant manner upon the question of whether [the individuals involved] in [plaintiff's] termination were aware of time cards being improperly completed and administered Sears['] clear time card falsification policy in a discriminatory manner." Id. The court emphasized that no one involved in the termination decision in that case

12

"was aware of or had investigated time card practices of other employees prior to [plaintiff's] termination." Id. The court thus rejected the plaintiff's pretext argument and affirmed summary judgment for the defendant. Id., 1366-1368.

As noted above, in the instant case, there is simply no evidence that Payne, or any other individual involved in plaintiff's termination, condoned or otherwise authorized sales sharing.[5] That Roberts and Fisher-Harper authorized sales sharing, tacitly or explicitly, does not establish that Payne's stated reason for firing plaintiff is pretext.

The undisputed evidence establishes that Payne created three categories of violations, based on the employees' varying degrees of involvement, and dispensed discipline accordingly. There is simply no evidence that the facts on which Payne relied in making those determinations, including both interviews of the nine employees involved in the sales sharing scheme, as well as the written statements produced as a result of Asset Protection's investigation, were insufficient to warrant plaintiff's termination. Nor is there any evidence that these facts did not actually motivate Payne's decision to terminate plaintiff.

The undisputed evidence is that every employee who received sales credit as a result of the sales sharing scheme was terminated. All of the employees who allowed their sales codes to be used, but did not receive revenue credit as a result, were suspended without pay. The two employees who disclaimed allowing their sales codes to be used, Barnes and Hawkins, received

---

[5]The court notes that the parties disagree about whether the scheme for which plaintiff was terminated actually involved "sales sharing" at all, since the sales that Childs "shared" with other Customer Advocates were not actually her own, but rather were negotiated by an Ameritech Authorized Distributor. This point is merely academic, however, since there is no evidence that Payne or the other individuals involved in the termination decision condoned or authorized "sales sharing" as defined by either party.

13

no discipline. Although plaintiff has produced evidence calling into question the veracity of Hawkins' story, it does not appear that Payne was made aware of that evidence during her decisionmaking process.

There is simply no evidence that Payne's three categories of discipline were pretext for discrimination. To the contrary, it appears that there were both African-American and white employees who received lesser punishment than plaintiff: of the employees suspended without pay, two were African-American and one was white; of the employees who received no discipline at all, one was African-American and one was white. In the instant case, it appears that similarly situated employees were disciplined similarly, regardless of race.

As the Seventh Circuit has noted, the court "does not sit as a super-personnel department that reexamines an entity's business decisions." Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 573 (7th Cir. 1998) (quotations omitted). Rather, the court's task is to determine whether the defendant employer has given an honest explanation of its behavior. Id. With these standards in mind, and in the absence of evidence to the contrary, the court concludes that defendant's stated basis for plaintiff's termination was not pretext. Accordingly, for this reason and plaintiff's failure to establish a prima facie case, defendant's motion for summary judgment is granted.

## CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment under Fed. R. Civ. P. 56 is granted.

**ENTER:** March 8, 2004

Robert W. Gettleman
United States District Judge